**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| STUART TURNER | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil No. WMN 02CV2451 |
| | : | |
| KANA SOFTWARE, INC. | : | |
| | : | |
| Defendant | : | |
| | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Comes now Defendant Kana Software, Inc by and through its counsel, Rebecca Newman Strandberg and Strandberg & Associates, PA and files this Memorandum in Support of its Motion for Summary Judgment pursuant to Rule 56 , F. R. Civ. Proc. and states as grounds:

**I. Statement of the Case**

On or about July 24, 2002, Plaintiff Stuart Turner ("Plaintiff" or "Turner") filed a Complaint alleging two counts--Count One for breach of contract, and Count Two for quantum meruit/unjust enrichment. Plaintiff was terminated on April 18, 2002 for performance. In his Complaint, Plaintiff, a former employee of Defendant Kana Software, Inc. ("Kana") has asked for payment of a commission on a agreement that he obtained from a client, Verizon Internet Solutions (herein VIS) which was contingent upon the client obtaining financing. VIS did not obtain financing to complete the deal during Mr. Turner's employment. Mr. Turner represented to management at Kana that the deal would close in March, 2002. This was a misrepresentation because Mr. Turner knew that the client did not have the financing in place to close the deal as of

1

that date.

Defendant was served; and a Motion for Default for failure to answer was filed and subsequently vacated by consent. Kana filed its Answer on October 21, 2002. Discovery has been completed. Defendant has produced over 1800 documents, and has taken the deposition of the Plaintiff. Plaintiff has produced one document and elected to take no depositions although Defendant offered to extend discovery for that purpose. Defendant served a Motion for Sanctions on Plaintiff on April 29, 2003 and is filing that Motion with the court simultaneously with this motion.

## II. Statement of the Issues

1. Defendant is entitled to judgment as a matter of law on the count alleging breach of contract as there is no genuine dispute of a material fact. Plaintiff was an employee at will with a commission plan that did not provide for commissions to be paid on contingent deals which could be canceled by the customer. Both parties agree that Plaintiff was employed under an express contract that was terminable at will, consisting of an offer letter (Exhibit 1) and the Kana 2002 North American Incentive Plan, (listed in the Exhibits as Exhibit 2 and referred to hereafter as Exhibit 2). Both parties agree that any commissions or incentives are controlled by Exhibit 2. Plaintiff is not due any incentives or commissions under the terms of that plan. Plaintiff did obtain any "qualified bookings" as defined by the Plan while he was employed at Kana. The agreement, which Plaintiff negotiated with a contingency allowing the customer to cancel if financing is not received, is not a qualified booking and would not generate a commission until

it was clear that the funding would be in place.[1]

2. Defendant is entitled to judgment as a matter of law on the count of quantum meruit/unjust enrichment. Maryland law explicitly states that quantum meruit/unjust enrichment is not applicable when there is an express contract.

### III. Statement of the Facts

Stuart Turner was hired by Kana Software as an Account Executive beginning on May 14, 2001. He had an express contract that was terminable at will consisting of an offer letter and an incentive or bonus plan. ( Exhibit 10, Turner dep. P. 92 , Exhibit 1 and 2 )  He was paid an annual salary of $100,000, plus he was able to earn incentives/commissions on sales he closed. He had a sales quota for each quarter.  His sales quota for each quarter of 2001 was $625,000. (Brian Moore affidavit, Exhibit 15)   His sales quota for 2002 was $625,000 a quarter. (Turner dep. Pp. 90-93, Exhibit 10; Kana Software Inc. 2002 North American Incentive Plan, Exhibit 2).

Kana has implemented a computer sales system that has a procedure for classifying potential sales. The portion of the system impacting sales is known as ISell.  Account Executives are to provide information on business opportunities, i.e. actual and potential sales,  within ISell and to update this information no less than weekly.  Account Executives' information includes the potential amount of revenue which may be expected from the opportunity, an estimation of the probability that a sale will close,  and an expected close date, i.e. 30%, 75%; June, July. Opportunities are also classified as "upside", meaning there is a small chance of closure within a

---

[1] A commercial enterprise could not stay financially viable if it paid its sales people commissions for deals before it was clear that the deal would not be canceled.

certain time frame, or "forecast" which means the opportunity is expected to close within the specific time frame. Reports based on this data are circulated within the company, and to the Board of Directors at Board Meetings, and are essential for the company to manage the business, project revenue, manage cash flow and resources. ( Exhibit 10, Turner dep, p 76-82; Tom Doyle affidavit, Exhibit 13; Moore affidavit, Exhibit 15)  Account Executives are judged on sales and their ability to accurately predict when sales will close. ( Affidavits of Tom Doyle, Kana President, Exhibit 13; Aaron Jaeger, Kana Revenue Manager, Exhibit 11; Brian Moore, Kana Senior Vice President, Exhibit 15)  An Account Executive who does not make any sales is a significant drain on the company and will be terminated.( Id)

 Mr. Turner did not make any sales in the three quarters of 2001 or in the first quarter of 2002. ( Exhibit 10, Turner dep. p. 64, Exhibit 13, Doyle affidavit).

Mr. Turner entered an enterprise deal with Verizon  for between six and seven and half million dollars into the I-Sell system in December, 2001.  He classified the deal as a "forecast" for that time period.  The deal never materialized and did not close. Putting the deal as "forecast" for the December, 2001, period  was inaccurate.  (Exhibit 10, Turner dep. 76-82;*,* Exhibit 13, Doyle affidavit; Exhibit 15, Moore affidavit)

In January, 2002, Mr. Tom Doyle, the Chief Operating Officer of Kana, had a discussion with Mr. Turner concerning his performance and his failure to accurately forecast his potential and actual sales. ( Exhibit 13, Doyle affidavit)

In March, 2002, Mr. Turner entered the VIS contract which is the subject of this litigation as "forecast"  to close on March 31, 2002. (Exhibit 8, See also Moore affidavit attesting that Exhibit 8 is a business record).   Mr. Turner knew that the agreement was a contingent

agreement, that the client did not have funding for the deal on March 31, 2002 and might not get funding which is why the client wanted the ability to cancel the agreement.. (Turner Dep. 185, 121-122 and email from Mr. Turner Exhibit 16 incorporated in Deposition) Because the contract was contingent and it was clear that the client did not yet have financing for the purchase, it was inaccurate to input the deal as "forecast" with a close date of March 31, 2002. When Tom Doyle found out about the contingency, he gave Mr. Turner until April 14, 2002 to remove the contingency. Once it was not removed, Mr. Turner was terminated for poor performance, i.e. failure to close deals and accurately forecast business. (Exhibit 7, Isell system Q1, 2002; Exhibit 13, Doyle affidavit)

After Mr. Turner's termination, significant work was done to close two different deals with Verizon Internet Solutions or VIS and GTE.NET, LLC. (Exhibit 12, Roever affidavit; Exhibit 15, Moore affidavit) Revenue was eventually recognized for accounting purposes on these two different deals in June, 2002. (Exhibit 11, Jaeger affidavit; Exhibit 9, Defendant's Answers to Interrogatories number 5). Actual collection of payment was first received on these different deals in August, 2002. (Id) [2]

### IV. Statement of Undisputed Facts

1. Stuart Turner was hired by Kana as a Account Executive to start on May 14, 2001 and to receive a salary plus commissions. He was in sales and given a sales quota. (Exhibit 10, Turner Dep. Pp 64-65).(Turner Offer letter, Exhibit 1)

---

[2] Assuming arguendo that there had been no other work necessary to close the deal with VIS, Mr. Turner would still have not been eligible for a commission under the express contract, i.e. the Kana North American Incentive Plan, Exhibit 2. No collection of payment was received until more than 30 days after his termination.

2. The April 30, 2001 letter from Kana which Stuart Turner signed, sets forth for his terms and conditions of employment including his salary. It also states "Your employment with Kana is not for a specific time. As a result, either you or Kana may terminate your employment at any time, for any reason, with or without cause." (Exhibit 1)

3. Mr. Turner was terminated for unsatisfactory job performance, i.e. his inability to forecast and close business on April 18, 2002. (Exhibit 3, Kana letter terminating Mr. Turner; Exhibit 10, Turner Dep. 136, 137; Exhibit 13, Doyle affidavit; Exhibit 15, Moore affidavit).

4. Stuart Turner received a salary of $4166.67 semi-monthly. (Exhibit 1; Exhibit 10, Turner Deposition 142-147)

5. Mr. Turner was paid all of the salary that he was owed. (Exhibit 10, Turner dep. 147)

6. The North American Incentive Plan controlled or governed when commissions were earned by Mr. Turner. (Exhibit 2; Exhibit 10, Turner dep. 143-147). The only agreements between Mr. Turner and Kana were the Incentive plan and his letter of employment dated April 14, 2001. (Exhibit 10, Turner Dep. 92, lines 5-9; Exhibit 1)

7. The Kana 2002 North American Incentive Plan provided that Account Executives earn a commission on "qualified bookings". The plan also provides that Kana has "sole discretion" to determine what is a qualified booking. Mr. Turner admitted during his deposition that Kana had the sole discretion to determine what is a qualified booking. (Exhibit 2; Exhibit 10 Turner 142-147).

8. Under the Kana North American Incentive Plan, commissions are paid as follows. Sales Representatives or Account Executives earn 50% of a commission by "securing" a "qualified booking". (Exhibit 2; Exhibit 10, Turner Dep. at 145) 50% of the applicable

commission will be earned by securing Kana's actual receipt of payment for qualified bookings previously secured by the employee (id ). Kana has "sole discretion" to determine what a qualified booking is (Exhibit 2; *see* Exhibit 10, Turner Dep. at 146)

The Plan provides that "Bookings not collected within 90 days of the original due date will be debooked and any previously paid commissions will be due back to KANA. (Exhibit 2)." Mr. Turner has admitted that this policy also applies (Exhibit 10,Turner Dep. at 35).

The Plan also provides that "Commissions will be deemed earned and payable if the collection on the original booking occurs within 30 days of an employee's last date of employment. Except for the foregoing, commissions not earned at the time employment terminates (for any reason) cannot be thereafter earned"(Exhibit 2).

9. Stuart Turner did not obtain a single "qualified booking" under the North American Incentive Compensation plan between May 14, 2001 and the time he was terminated on April 18, 2001. (Exhibit 10, Turner deposition pp 85-86)

10. Mr. Turner obtained a contingent order from two Verizon subsidiaries, VIS and GTE.net, LLC , referred to herein as VIS, on or about March 25, 2002 for $2,643,200.(Exhibit 4) This order was never signed by GTE.net, LLC and the Purchase Order was not signed at all. This order could be canceled by VIS until April 23, 2002.  (Exhibit 10, Turner Dep 121 .inc exhibit 16, an email from Stuart Turner dated March 22, 2002; Exhibit 12, Roever affidavit )

11. Stuart Turner sent an email to Brian Moore concerning the VIS agreement signed on or about March 25, 2002 and stated: " Verizon has agreed to get the agreement signed by March 31st if we will give them an out as part of the above mentioned paragraph. The out is if they can not get their funding by 23rd April they can walk away from the deal. Although we will not be

able to book this, this quarter,". ( Exhibit 10, Turner dep. 121, Exhibit 16; See also Moore Affidavit)

     12. Aaron Jaeger, Kana Revenue Manager, made a determination that the VIS agreement dated March 31, 2002 and signed on or about March 25 by VIS, was a contingent order, i.e. Exhibit 4, could not be recognized as revenue and was not a qualified booking which would have entitled Plaintiff to incentive pay under Exhibit 2. ( Exhibit 2; Exhibit 11, Jaeger affidavit)

     13. The deal represented by Exhibit 4, was not disclosed to independent auditors or the SEC in the first quarter of 2002, was not included in the income statement or the balance sheet for the first quarter of 2002 and was not announced to the public. It was never consummated. (Exhibit 11, Jaeger affidavit)

     14. Brian Moore, Senior Vice President of Sales Operations, told Mr. Turner that he needed to have the contingency in the VIS agreement dated March 31, 2002 removed quickly. (Exhibit 10, Turner deposition 181-183; Exhibit 15, Brian Moore affidavit)

     15. Tom Doyle, Kana Chief Operating Officer, was concerned about Mr. Turner's lack of sales and inability to accurately forecast sales. After Mr. Turner did not close the deal he had forecast to close in the first quarter of 2002, Mr. Doyle gave Mr. Turner the first two weeks in April to remove the contingency and close the deal. The contingency was not removed in that time frame, so Mr. Turner was terminated on April 18, 2002. (Exhibit 13, Doyle affidavit)

     16. Kana did enter into two agreements with Verizon subsidiaries in May and June of 2002. (Exhibits 5, 6, Exhibit 12, Affidavit of Geoff Roever)

     17. The two agreements between Kana and Verizon subsidiaries had different terms and conditions than the contingent VIS agreement signed on March 25, 2002. Both of these

agreements had the necessary language for Kana Finance to recognize revenue, the contingencies were removed or canceled from the agreements, they had different monetary and other terms and conditions and they were signed by the necessary parties. (id )

18. Significant work was done by Kana Marketing and Sales personnel, including Gary Belonzi on completing the agreements referred to as Exhibits 5 and 6, a sale of software to VIS and GTE.NET, LLC after April 18, 2002. ( Exhibit 15, Moore affidavit, Exhibit 12, Roever affidavit)

19. No revenue was received on the March agreement signed by VIS listed as Exhibit 4.(Exhibit 11, Jaeger affidavit)

20. No collection of payment was received from any agreement with subsidiaries of Verizon until August, 2002, more than 30 days after Mr. Turner was terminated. (Exhibit 9, Defendant's Answers to Interrogatories, Number 5; Exhibit 11, Jaeger affidavit )

## II. Argument

**A. Defendant Is Entitled to Summary Judgment Because it Is Clear That There Is Plaintiff Is Not Eligible for Commissions under the Parties' Express Contract (Count One).**

Count One of the Complaint is a claim for commissions covered by the Kana Software Inc. 2002 North American Incentive Plan, Exhibit 2 herein. An employment arrangement is a matter of contract law. Adler v. American Standard Corp., 291 Md. 31, 432 A.2d 464 (1981). Staggs v. Blue Cross of Maryland, 61 Md. App. 381, 486 A.2d 798, cert. denied, 303 Md. 295, 493 A.2d 349 (1985). Where there is an express contract the provisions of that contract govern the employment arrangement. County Commissioners of Caroline County v. R. J. Dashiells, 358

Md. 83, 101; 747 A.2d 600, 609 (2000). (see ,infra, footnote 3, & 4)

As stated above, Plaintiff admitted in his deposition testimony that Exhibit 2 governs when commissions will be paid. (Undisputed facts numbers 6,7). After discovery, it is clear that Plaintiff can offer no facts that would establish this claim. Defendant is entitled to summary judgment and to sanctions.

**1. Plaintiff admits that commissions were governed by a written Plan.**

Plaintiff admitted in his deposition that the express contract governed any commission payments. Plaintiff also admitted that the Plan in Exhibit 2 controlled or governed when commissions were earned. (Exhibit 10, Turner Dep. at 145). Commissions are paid as follows.

Sales Representatives or Account Executives earn 50% of a commission by "securing" a "qualified booking". ( Exhibit 2; Exhibit 10,Turner Dep. at 145) 50% of the applicable commission will be earned by securing Kana's actual receipt of payment for qualified bookings previously secured by the employee (Exhibit 2). Kana has "sole discretion" to determine what a qualified booking is (Exhibit 2; *see* Exhibit 10, Turner Dep. at 146). Mr. Turner admitted these points in his deposition. (Id)

Moreover, the Plan to which Mr. Turner acquiesces provides that "Bookings not collected within 90 days of the original due date will be debooked and any previously paid commissions will be due back to KANA... (Exhibit 2)." Mr. Turner has admitted that this policy also applies (Exhibit 10, Turner Dep. at 35).

The Plan also provides that "Commissions will be deemed earned and payable if the collection on the original booking occurs within 30 days of an employee's last date of employment. Except for the foregoing, commissions not earned at the time employment

10

terminates (for any reason)" cannot be thereafter earned"(Exhibit 2).

**2. Plaintiff admits that he earned no commissions during his employment with Kana from May 14, 2001 to April 18, 2002.**

During Plaintiff's employment, from May 14, 2001 until his termination on April 18, 2002, Plaintiff conceded in his deposition that he did not earn any commissions, nor did he have any sales which would qualify for commissions ( Exhibit 10, Turner Dep. at 64 ). It is therefore undisputed that Mr. Turner failed to meet his quota for the third quarter of 2001, the fourth quarter of 2001 or the first quarter of 2002. Mr. Turner also admitted that he has been paid all of the salary that he was owed by Kana ( Exhibit 10, Turner Dep. at 92).

On or about March 31, 2002, Plaintiff made a contingent sale (Exhibit 10, Turner Dep. at 17) to the entity most commonly referred to herein as Verizon Internet Solutions (*see* Exhibit 10, Turner Dep. at 96) ("VIS"). Plaintiff obtained the following agreement before his termination, Addendum Two thereto, dated March 25, 2002 . (Exhibit 4; Exhibit 10, Turner Dep. at Exhibit 12); The sale required, however, that VIS obtain appropriate funding by April 23, 2002 (Exhibit 10, Turner Dep. at 119). The sale was strictly contingent upon procurement of the necessary funding. Mr. Turner was well aware of the fact that the sale was contingent. See undisputed fact number 11 and the email cited therein.

VIS did not subsequently obtain the funding within the agreed time frame (Exhibit 10, Turner Dep. at 183-84), and requested that their right to cancel the sale be extended. As a result, the sale was not completed during Mr. Turner's employment. This transaction did not constitute a "qualified booking" under the Incentive Plan for which Mr. Turner was entitled to a commission.

Mr. Aaron Jaeger is the Revenue Manager at Kana. He reviews agreements and deals to determine if they may be recognized as revenue and if the booking is a qualified booking. To be a qualified booking and recognized as revenue there are 4 factors which must be met; (1) persuasive evidence of an agreement, (2) fixed and determinable conditions in the agreement,(3) can the revenue be collected and when, and (4)when can the software be delivered. Mr. Jaeger reviewed the March 31, 2002 agreement labeled as Exhibit 4 on or about March 29, 2002 and determined that it was not a qualified booking and could not be recognized as revenue. He immediately communicated with Geoffrey Roever, Associate General Counsel for Kana and Brian Moore, Senior Vice President of Kana and told them that additional conditions had to be included in the agreement. Brian Moore, Senior Vice President and Mr. Roever then communicated with Mr. Turner that the agreement as it was drafted was inadequate. (Exhibit 11, Jaeger affidavit; Exhibit 12, Roever affidavit; Exhibit 15, Moore affidavit and the emails attached thereto) These problems were not corrected in the VIS agreement before Mr. Turner was terminated by Kana.

It is patently not good business sense to credit as "qualified" a sale that may be canceled by the client because they do not have funding and pay a commission on a deal that may never occur. Since the revenue was not "fixed and determined" as required by General Accounting Principles and by Kana's internal guidelines, it was not a qualified booking and could not be taken as revenue. (Exhibit 11, Jaeger, affidavit)

Mr. Turner was well aware that his employment at Kana depended upon his closing deals and accurately forecasting sales. (Exhibit 10, Turner dep.76-81) He was also aware from the emails with Geoff Roever that the agreement signed by VIS was not a completed agreement.

(Exhibit 12, Roever affidavit and attached emails ) He was also aware that it was a contingent deal. See undisputed fact number 11 and citations therein.

In fact, after Mr. Turner's termination the subject agreements were substantially changed (Exhibit 10, Turner Dep. at Exhibit 11; Exhibit 5 and 6; Exhibit 11, Jaeger affidavit) A different agreement was reached with Verizon on or about June 3, 2002, in accordance with new terms different from those existing during Plaintiff's tenure.  No payment was collected on that agreement until August 20, 2002 (Exhibit 9, Defendant's Answers to Interrogatories, Answer 5; Exhibit 11, Jaeger affidavit).

For these reasons, Plaintiff was clearly not entitled to a commission on a sale initiated in March, 2002, but not effectuated during Plaintiff's employment or within 30 days after his termination, and requiring significant work after his termination.

Plaintiff was aware from the emails he had from Brian Moore and Geoffrey Roever that the agreement he had signed was a contingent agreement that could be canceled by Verizon. He was aware he was not due a commission/incentive on the sale.(See Exhibit 10, Turner Deposition, page 117, Exhibit 14 attached thereto; See emails attached to Exhibits 15 and 12). Plaintiff's suit was not warranted under the facts and Defendant is entitled to summary judgment on Count One and should be awarded sanctions for Plaintiff's having filed this suit in bad faith.

### B. COUNT TWO IS NOT WARRANTED UNDER MARYLAND LAW

Count Two of the Complaint is a claim for quantum meruit/unjust enrichment.  Plaintiff had an express employment contract which governed any compensation. Maryland law precludes suit on quasi-contract claims where there is an express contract.  Plaintiff admits that an express contract governs here. (Exhibit 10, Turner Dep. 35, 142-147)  Accordingly, Count Two is not

"warranted under existing" law, specifically a 2000 Maryland Court of Appeals case, and Defendant is entitled to Summary Judgment, as well as sanctions under Rule 11 (b)(2) of the Federal Rules of Civil Procedure. Defendant incorporates by reference the accompanying Motion for Sanctions filed today and served on Plaintiff on April 29, 2003.

The Court of Appeals of Maryland explicitly ruled in <u>County Commissioners of Caroline County v. R. J. Dashiells</u>, 358 Md. 83, 101; 747 A.2d 600, 609 (2000) that quantum meruit/unjust enrichment claims cannot be brought when there is an express contract that defines the rights and remedies of the parties.[3] The Court also held that express contracts include both written and oral agreements. Id. 358 Md. 83, 95, 747 A.2d 600, 606. <u>Accord Mass Transit Admin. v. Granite Const. Co.</u>, 57 Md. App. 766, 779; 471 A.2d 1121, 1128 (1984).[4]

The express contract herein, which was terminable by either party at will, consists of an offer letter (Exhibit 1) and Exhibit 2 (collectively, the "express contract"). Mr. Turner admitted in sworn testimony during his deposition that the Compensation Plan governed commissions (Exhibit 10, Turner Dep. at 91).

---

[3] "There was an express contract between the parties that controlled this subject matter; therefore, Respondent cannot seek relief through the quasi-contractual remedy of unjust enrichment. We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Id.*, 358 Md. 83, 10; 747 A.2d 600, 609 (2000).

[4] Mr. Turner's employment agreement was effectuated by his execution of an appropriate letter signed in Maryland. His subsequent services were performed out of his home office located in Maryland.

For these reasons, Defendant is entitled to summary judgment on this count.[5]

### IV. Conclusion

Plaintiff's claim for quantum meruit/unjust enrichment is expressly disallowed under a Maryland Court of Appeals decision published in 2000.  Further, Plaintiff agrees that his commissions were governed by an express contract, including, in relevant part, Defendant Kana's 2002 North American Incentive Plan, Exhibit 2.  Since Plaintiff admits that he did not obtain any qualified bookings during his employment and it is undisputed that Defendant did not receive any collections within 30 days of his termination on any qualified bookings, under the Plan Plaintiff is not entitled to commissions.  There clearly was, as a result, no breach of contract.

---

[5] Defendant sent Plaintiff two letters attempting to resolve the issue of quantum meruit without filing for sanctions.  Plaintiff, at that time, indicated that there was an implied covenant of good faith and fair dealing in EVERY contract in Maryland.  Defendant sent the enclosed letter to Plaintiff indicating that in the case of **Suburban Hospital v. Dwiggins** 324 Md. 294, 309-10, 596 A.2d 1069, 1076-77 (1991), the Maryland Court of Appeals specifically held there was no covenant of good faith and fair dealing in an at will employment arrangement.  It is undisputed that Mr. Turner's employment was employment at will. See Exhibit 1, Mr. Turner's letter of employment. Plaintiff indicated that they had contrary law but refused to provide it and have not provided it to date.

**WHEREFORE** Defendant prays that:

1. Summary judgment be entered against Plaintiff.

2. Plaintiff be ordered to pay reasonable attorney's fees pursuant to Rule 11 (b)(2) and (3), Federal Rules of Civil Procedure; and

2. For such other relief as this Honorable Court deems just and proper, or justice may require.

A proposed Order is enclosed.

Date: May 21, 2003            Respectfully submitted,

_____/s/_____
Rebecca N. Strandberg, Esquire
Maryland Federal Bar No. 02196
REBECCA N. STRANDBERG & ASSOCIATES, P.A.
4405 East West Highway, Suite 308
Bethesda, Maryland  20814
301-656-9547
Strandberglaw@aol.com

**REQUEST FOR HEARING**

Defendant respectfully requests a hearing on this motion.

_____/s/_____
Rebecca N. Strandberg

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** this 21st day of May, 2003 that a copy of the foregoing Motion

for Summary Judgement was served electronically on:
    Mark London, Esquire
    Christopher B. Mead, Esquire
    London and Mead
    Suite 320
    1225 19th Street, N.W.
    Washington, D.C. 20036
    Counsel for Plaintiff Stuart Turner

                                                                             _____/s/_____
                                                                      Rebecca Newman Strandberg, Esquire

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| STUART TURNER | : | |
| Plaintiff | : | |
| v. | : | Civil No. WMN 02CV2451 |
| KANA SOFTWARE, INC. | : | |
| Defendant | : | |

**UPON CONSIDERATION** of Defendant's Motion for Summary Judgment herein, and any Opposition thereto, it is by the Court this _____ day of _____, hereby ORDERED that the said Motion be, and hereby is GRANTED, and it is further ORDERED

that Judgment is granted for the Defendant and the Complaint is dismissed with prejudice; and it is further ORDERED,

that Plaintiff be, and hereby is directed to pay _____ in attorneys fees; and it is further ORDERED

_____
_____
_____.

So ordered.

_____
**JUDGE**

cc:
Rebecca N. Strandberg, Esquire

Rebecca N. Strandberg & Associates, P.A.
4405 East West Highway, Suite 308
Bethesda, Maryland  20814

Christopher B. Mead, Esquire
London and Mead
Suite 320
1225 19th Street, N.W.
Washington, D.C.  20036