IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| STUART TURNER | : | |
| Plaintiff | : | |
| v. | : | Civil No. WMN 02CV2451 |
| KANA SOFTWARE, INC. | : | |
| Defendant | : | |

AFFIDAVIT OF AARON JAEGER

My name is Aaron Jaeger. I am over 18 years old and competent to testify to the matters in this affidavit. The facts in this affidavit are based upon my personal knowledge and knowledge as an employee of Kana Software, Inc.

I have been employed at Kana Software, Inc. since July 19, 2000. My title is Revenue Manager. My duties have always been those of a Revenue Manager. I am in the Accounting/Finance Group. My supervisor is the Corporate Controller, Michelle Philpot, who has been in that capacity since October of 2001. My job duties are to ensure that we keep in compliance with Generally Accepted Accounting Principles (GAAP) and ultimately SEC Financial guidelines and regulations. I also supervise all distribution of software, payment of commissions to domestic employees, and royalty payments due to third party original equipment manufacturers (OEM).

My job duties during the time that I have been at Kana have included working with the Sales Department. I work with the Senior Vice President Brian Moore to analyze sales transactions and to manage the revenue. I have input with the sales force and the legal department on how to construct deals or agreements for sales, collection matters, and the documents needed to accept a given order. Often times, I deal with the Account Executives who make the sales directly, advising them on terms needed to complete the sale. I make the determination as to when revenue may be taken on an agreement based on the GAAP standard for software revenue recognition (Including, but not limited to SOP 907-2, SOP 98-9, and SAB 101). I determine when a deal or a sale is a "qualified booking" for purposes of Kana's Incentive Plan for Account Executives. I also determine when software may be shipped.

Kana acquired several entities, including Silknet Software, Inc. during 2000 and 2001. Said entities may have had different criteria for determining a qualified booking. Once an entity was acquired, Kana's booking policy would be applied to determine what constituted a qualified booking. Since KANA's most recent acquisition of Broadbase Software, Inc. in June 2001, Kana has always required that a sales deal not be contingent in order for it to be recognized both as revenue and as a qualified booking for purposes of earning a commission under the Kana North American Incentive Plan.

I have never met Stuart Turner. We may have been copied on sales related emails but I have not sent him an email nor have I talked with him. I often have contact with Account Executives, helping them craft transactions, and close deals so they will meet all criteria for revenue recognition. It would be consistent with my experience for me not to have had any contact with Mr. Turner since he had not closed any deals in any of the three quarters of 2001 or the first quarter of 2002 when he worked at Kana. Account Executives are judged on closing revenuable-sales and meet their quota. If they do not make any sales for several quarters then they usually are not retained by Kana because they are not producing and it is not cost effective for Kana to pay a sales representative who is not producing. Kana's Account Executives are measured on the quota system and their performance is evaluated by Tom Doyle, who was Chief Operating Officer in 2002, Brian Moore, Senior Vice President, and Chuck Bay, the Chief Executive Officer. Tom Doyle has significant input into the hiring and retention of the Sales Force.

There are four general standards that I use to determine when to recognize revenue on a deal for Kana. They are as follows:
1. Persuasive Evidence of an Agreement - There must be executed order which a customer orders/procures Kana software. This can be a multitude of documents in various forms, but, in general, an order is one of three documents:
    a.) A Purchase Order
    b.) A Software License Agreement (SLA) with embedded order
    c.) A Purchase Agreement (e.g. an amendment to the initial SLA)
2. Fixed and Determinable Conditions:
The terms of the agreement must be such that they can be legally enforced and are non-recourseable (i.e non-refundable).–Essentially, the test is to determine if the fees agreed upon are at a set amount and is not subject to refund or further deliverables outside the scope of the agreement.
3. Collectibility:
The collectibility of a customer is assessed on a binary basis. Will the customer remit payment? If yes, then the criterion is satisfied. If no, then the fees will be deferred until collected.

Kana employs its own customer history as well as Duns & Bradstreet reports to verify the customer's ability to remit the agreed upon fees.

4. Delivery

The final criterion measured is that of delivery. Revenue may only be recognized for those elements delivered on a given order. In Kana's case, there are typically two to three deliverables on a typical order.

    a.) Software (a.ka. License revenue)
    b.) Maintenance (a.k.a Support Revenue or Post-Contract Support [PCS])
    c.) Services (a.k.a. Professional Services, Consulting, Training)

Kana, a true software company, is primarily concerned with the delivery of the Software element. On a given Order, the Software element composes 80-90% of the fees. Once delivered, Kana may recognize this portion of the fees as revenue. The other two elements are immaterial. For notation, the Maintenance element is amortized over the contract period. The Services element is recognized as performed.

A deal will be considered a qualified booking under Kana's North American Incentive Plan when Kana <u>can</u> recognize revenue on the deal.

In the normal course of business I automatically receive copies of agreements or orders to review them and make the determinations required by my job.

On or about March 29, or 30, 2002, I received the attached order listed as Exhibit 4 from Jerry Shinn, Vice President of Sales, from Verizon Internet Solutions, VIS. When I received the attached order, I made the determination that the agreement did not meet the criteria to recognize revenue or be a qualified booking for purposes of the Kana 2002 North American Incentive Plan. Only one of the four factors were met for revenue; that being persuasive evidence of an agreement. The contract/order was not legally enforceable because the customer had the complete right to cancel the deal any time before April 23, thus was a contingent agreement not meeting the standard of being fixed or determined. Moreover, the Order was determined not collectible based on the customer's ability to cancel the order. Based on Verizon's option to cancel the order, we did not ship production software. For these reasons, Kana did not recognize revenue for that agreement in Q1 of 2002. I also saw that the customer had changed the original payment terms and that those payment terms were not acceptable to Kana. Rather, Kana has standard terms and conditions for a customer to remit payments (less than ninety days). Anything outside of the standard terms and conditions is deferred and <u>recognized as payments come due</u>. I informed the sales department and the legal department that those terms would have to be changed.

The attached order was not included in revenue in the first quarter of 2002, was not disclosed to independent auditors or SEC in the first quarter of 2002, was not included in the

income statement or the balance sheet for the first quarter of 2002 and was not announced to the public because of the deficiencies outlined above.

I was aware that a deal with Verizon Internet Solutions or VIS was under negotiation and approximately how much the order was for, but I did not know the shipping terms nor the payment terms nor that it was contingent until I received the document listed as Exhibit 4 and dated March 31 for VIS on March 29, 2002. This agreement was for a sale of $2,643,800 and was never consummated.

I work with the I-Sell system at Kana. I-Sell is the system that tracks sales from the time that it is an "opportunity" until such time as the software is actually shipped. As of January 1, 2002, I have to input an electronic queue within the I-Sell system approving a sale before software is delivered. I never approved shipping of software licenses on the sales opportunity for the VIS March 29, 2002 agreement listed as Exhibit 4.

The I-Sell system tracks sales and potential sales from the time that each is an "opportunity" until such time as the software is actually shipped. Leads for sales are generated by the marketing department and given to the Account Executives who determine if the deal or opportunity is viable. Once the determination is made that the deal is viable, an opportunity is created in the I-Sell system and the opportunity is given a four-digit unique number. That number is then used to input information into the system. Account Executives and management may make entries into the I-Sell system about that "opportunity.. Everyone from the Vice President on down can see in the system. An Account Executive will then mark the opportunity as "forecast" which would indicate that ~~means~~ we anticipate this closing in this quarter. An Account Executive may mark a deal " Upside" which means we have an opportunity to close the deal, but if it closes, it will be an added bonus and should not be counted on for that quarter. The I-Sell system also allows you to see on which opportunities an Account Executive or his manager/Vice President is working.

Kana received and accepted two separate different deals that removed the cancellation privileges or cancellation privileges that had lapsed after cancellation privilege date. The first order totaled $336,000 and was received as of June 3, 2002, faxed in June 4, 2002. The software was shipped on or about that date. Verizon signed the order on May 31, 2002 and Kana signed on June 4, 2002. Upon delivery, Kana began the revenue cycle for the various elements (Recognized the full license fees [$300,000] in June of 2002 and amortized the maintenance fees [$36,000]) See Exhibit 5.

The second order was received on 6/21/02 for $1,948,800. Kana Sales might have had this agreement in hand before that time but Kana Finance did not get it until this time. The software was shipped on or about that date. Verizon signed the order on June 21, 2002 and Kana signed on June 21, 2002. Upon delivery, Kana began the revenue cycle for the various elements

(Recognized the full license fees [$1,714,480] in June of 2002, amortized the maintenance fees [$208,800], and deferred the services [$25,520]). See Exhibit 6

The total for these two deals in Exhibit 5 and 6 was for $2,284,800 or $358,400 less than the VIS agreement dated March 31, 2002 and identified as Exhibit 4.

In October 2001, Kana began to scale down and right size its operations. There were numerous personnel changes and many people in the Sales Department were let go over the next few months. In March 2002, there were approximately 36 Account executives. There are now approximately 18.

I swear and affirm under the penalties of perjury that the above information is true and correct under the penalties of perjury.

_____/s/_____
Aaron Jaeger

Dated: 5/21/03