IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| STUART TURNER : | |
| : | |
| Plaintiff : | |
| : | |
| v. : | Civil No. WMN 02CV2451 |
| : | |
| KANA SOFTWARE, INC. : | |
| : | |
| Defendant : | |
| : | |

AFFIDAVIT OF TOM DOYLE

I am Tom Doyle, am over 18 years of age and competent to testify in this matter. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the President of KANA Software, Inc ("KANA"). I have held that position since April 1, 2003. In the time immediately preceding my appointment as President, I was the Chief Operating Officer of KANA. As Chief Operating Officer my duties included managing KANA's business generally, including Company strategies, business model and tactics; and specifically, the sales organization and KANA's revenue targets, projections and actual revenue received . My office is in Menlo Park, California.

Stuart Turner was an Account Executive at KANA from May 14, 2001 until April 18, 2002. Mr. Turner's responsibilities included making sales calls on specified customers, accurately forecasting the timing, likelihood, and amount of potential sales (maintaining at least sufficient understanding of and contact with the customer so that he could accurately forecast whether the customer had the funds to make a purchase and when the purchase would be made), updating the internal customer database, and actually producing sales. Account Executives are judged not only on their ability to make sales but also on their ability accurately to forecast sales and maintain the customer relationships. Because KANA is a public company that manages its business and spending from the revenue projections and sales forecasts, it is essential for an account executive to understand the purchasing process at his customers site so that he can accurate forecast when and if potential sales would be made.

KANA has implemented a sales computer system that has a procedure for classifying potential sales. The portion of the system impacting sales is known as I-Sell. Account Executives are to provide information on actual and potential sales within ISell and to update this information no less than weekly. This information includes an estimation of the probability that a sale will close and an expected close date, i.e. 30%, 75%; June, July. Opportunities are also classified as "upside", meaning there is a small chance of closure within a certain time frame, or "forecast" which means the opportunity is expected to close within the specific time frame. Reports based on this data are circulated within the company, and to the Board of

Directors at Board Meetings, and are essential for the company to manage the business, project revenue, manage cash flow and resources.

Mr. Turner continuously provided inaccurate information concerning sales and potential sales. I had a discussion with Mr. Turner at a sales meeting in January concerning his performance and his failure accurately to forecast his potential and actual sales. I made it clear to him that this was an important part of his job. Mr. Turner made it clear that he understood that this was part of his job.

When Mr. Turner began working at KANA in May, 2001, he had a sales quota for each quarter. He was given specific accounts on which to work, including certain divisions of Verizon. At that time, KANA already had existing contracts with and had made sales to Verizon, some as far back as March of 2000. The Verizon deal was originally forecast by Mr. Turner as noncontingent in the last quarter of 2001, and initially in the first quarter of 2002. When the order finally came in, in March, 2002, it was a clearly a contingent deal. The order had the contingency that allowed Verizon to cancel the order up to April 23, 2002 unless they were able to find funding. There were some indications from Verizon that the order would be cancelled unless the contingency was moved forward to May 31. It became clear that Mr. Turner did not know the status of the order and that was not acceptable. It became clear that Verizon did not have the funding in place to actually make the purchase. This was the case on March 31, 2002 when Mr. Turner had classified the opportunity in ISell as "Forecast" and was the case in April when he was terminated. It was clear to me that the situation at Verizon was inconsistent with how Mr. Turner had forecasted the deal internally. After the contingent order was received in March 2002, I talked with Mr. Turner's managers and gave Mr. Turner some additional time in which to finally close the Verizon opportunity. When it was clear that the opportunity was not going to be finally closed within the additional time I gave him, I made the decision to terminate him.

Mr. Turner was terminated because of his inability to forecast and close business. He did not know the purchasing process at his customers and was unable accurately to forecast status of business. Mr. Turner was not able accurately to forecast or close sales. His performance was below minimal expectations. From May, 2001, until his termination, Mr. Turner did not make a single qualified booking which would have entitled him to a commission. Moreover, Mr. Turner would misrepresent the status of his accounts. For example, Mr. Turner would represent that a sale was closed when in fact the customer had no funds to effect the purchase. He did not understand the status of the sale within the customer's internal purchasing process. I made the decision to terminate Mr. Turner based upon his lack of performance. This decision was made after discussions with his managers and other managers in the company, and after his inability finally to close the opportunity with Verizon.

I also held Mr. Turner's manager, Jerry Shin, accountable for the inaccurate forecasts. I told Mr. Shin that as a Vice President of the company he was as responsible for Mr. Turner for the inaccurate forecasts and for not managing his employees appropriately. I told him he was personally responsible for correcting the mistakes of Mr. Turner. Ultimately, as the Chief Operating Officer of KANA, I would also be held accountable to the Chief Executive Officer, and Board of Directors for Mr. Turner's misrepresentations of KANA's revenue prospects, and

the failure to close the Verizon opportunity. Mr. Turner's abysmal performance and misrepresentations could have adversely impacted KANA's relationship with Verizon, it did impact our business decisions about how to manage the negative revenue impact, it impacted my credibility and that of his managers with KANA and the Board, and it reflects poorly on me.

    I swear and affirm under the penalties of perjury that the above information is true and correct under the penalties of perjury.

_____/s/_____
Tom Doyle