IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
~Northern Division~

| | |
|---|---|
| **STUART TURNER,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. WMN 02CV2451 |
| ) | |
| **KANA SOFTWARE, INC.,** ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Stuart Turner was a sales Account Executive for Defendant Kana Software, Inc. ("Kana"). Kana obligated itself in writing to pay Turner commissions for sales that occurred during his employment and shortly after his termination. As a result of Turner's efforts, Verizon signed a contingent contract to purchase software from Kana. Kana then fired Turner before Verizon removed the contingency. Kana received over $2,200,000 from Verizon within months after firing Turner. Kana did not pay a sales commission to Turner or any other salesman. Turner has brought this suit to recover the unpaid sales commission from Kana.

Jerry Shinn, Plaintiff Stuart Turner's supervisor at Kana, has submitted a sworn Declaration saying:

> I concluded that Mr. Doyle's primary motivation in firing Mr. Turner was to deprive Mr. Turner of a commission on the Verizon deal, and to increase Kana's profitability by not paying a sales commission to anyone. I concluded this based on Mr. Doyle's lack of personal knowledge about Mr. Turner's skills as a salesman, Mr. Doyle's disregard of my opinion that Mr. Turner was an excellent salesman who was not at fault for the delay in closing the Verizon deal, Mr.

>Doyle's insistence that no salesman would receive a commission on the Verizon deal, and Kana's financial difficulties at the time.[1]

Defendant Kana argues that it fired Plaintiff Turner because he had inaccurately forecast when the Verizon deal would close. In his Declaration, Jerry Shinn contradicts this: "[h]istorically there were other large deals that were forecasted in prior quarters that were not closed as forecasted and those sales reps were not fired."

This case presents a sharp dispute over the reasons that Defendant Kana fired Plaintiff Turner. This dispute is legally material, because by firing Turner, Kana prevented Turner from fulfilling a contractual requirement for receiving payment under Kana's commission plan—that Turner be employed when the Verizon deal closed. Maryland's implied covenant of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker v. Columbia Bank*, 91 Md. App. 346, 366, 604 A.2d 521, 530 (1992), *citing Automatic Laundry Service v. Demas*, 216 Md. 544, 141 A.2d 497 (1958). Maryland precedent strongly suggests that Maryland would recognize a cause of action for breach of an implied covenant of good faith and fair dealing when an employer fires an at-will employee with the intent to deprive the employee of a commission.

## STATEMENT OF DISPUTED FACTS

Mr. Turner worked as a salesman for Silknet, a software company that was acquired by Defendant Kana in 2000. Mr. Shinn supervised Turner during his employment at Silknet/Kana.

---

[1] Declaration of Jerry Shinn ("Shinn Dec."), paragraph 12, attached as Exhibit 1 to this Memorandum.

While working for Silknet/Kana in 1999-2000, Turner significantly exceeded his sales quotas, bringing in over $10,000,000 in gross revenues.[2]

In early 2001, Turner voluntarily left employment at Silknet/Kana to work for a start up company. After Kana acquired Silknet, Shinn recruited Turner to return to work selling software. Turner began work for Kana as an Account Executive in May, 2001. Turner's sales quota was $625,000 per quarter in 2002. Kana promised that it would pay Turner commissions under the terms of its written North American Incentive Plan.[3]

When technology stocks and internet companies began to lose value and financing, the market for Kana's software declined significantly. In this difficult market, Turner and other Kana salespeople had problems closing sales. Turner did not close any sales during 2001.[4]

Turner focused his sales efforts on Verizon. In late 2001, Verizon employees indicated a willingness to purchase over $6,000,000 of Kana's software. Based on those representations, Turner forecast that a significant sale to Verizon was likely to close in the last quarter of 2001. Kana and Verizon exchanged drafts of sales contracts in late 2001. Verizon underwent a significant management change at the end of the year, killing the potential Kana deal and other similar projects.[5]

---

[2] Declaration of Stuart Turner ("Turner Dec."), paragraph 2, attached as Exhibit 4 to this Memorandum.

[3] Turner Dec., paragraph 3, Ex. 4; Defendant's Memorandum in Support of its Motion for Summary Judgment ("Kana's Memo") at 3.

[4] Turner Dec., paragraph 4, Ex. 4.

[5] Turner Dec., paragraph 5, Ex. 4.

In early 2002, Verizon employees indicated a willingness to purchase over $2,200,000 of Kana's software. Based on those representations, Turner forecast that a sale to Verizon in the first quarter of 2002. Verizon began negotiating a written contract to purchase Kana's software, but in March, 2001, insisted on adding a contingency that would allow Verizon to back out of the contract if it could not secure internal financing.[6]

On March 31, 2002, Verizon signed a contingent contract to purchase Kana's software. While Turner was working to remove the contingency with Verizon, Tom Doyle, Kana's Chief Operating Officer, ordered Mr. Shinn to fire Turner. Shinn told Doyle that Turner was an excellent salesman, and that delays in closing the Verizon deal were not Turner's fault.[7] Doyle had never been on a sales call with Turner, and had never seen Turner interact with any customers. Doyle had never received any complaints about Turner's performance for any actual or potential customers.[8]

Nonetheless, Doyle announced that <u>he</u> would fire Turner and ensure that Turner would not receive a commission, even if the Verizon deal closed while Turner was still employed. On April 11, 2002, Doyle wrote an e-mail to Shinn that read:

> . . . So we are clear. Stuart's last day is Tuesday irrespective of when this deal gets done. If it come [sic] in on Wed. for $20m+ that loser unprofessional amateur is fired irrespective and we owe him nothing other than a thorough beating in the parking lot. If you cannot execute on this clear COO directive I will

---

[6]Turner Dec., paragraph 6, Ex. 4.

[7]Shinn Dec., paragraph 9, Ex. 1.

[8]Defendant Kana Software, Inc.'s Response to Plaintiff Stuart Turner's First Request for Admissions, responses to requests 23-24.

>handle the heavy lifting for you. . . . Fire this incompetent organism immediately.[9]

On April 16, 2002, Doyle wrote:

>Now that Stuart is terminated I want you to personally take the Verizon account until we get the current order and have a clear strategy to close the additional business in the next two quarters. It is your account. The worst I've ever seen. Get that parasite out of my company. Stuart gets paid nothing on any Verizon deal. Verify that looser [sic] is off email, locked out of our property and we have all KANA assets back from him. He has polluted you and me.[10]

Doyle's statements that Kana would not pay Turner a commission even if the Verizon deal came in the day after he was fired contradicted the terms of Kana's 2002 North American Incentive Plan, which provided that "Commissions will be deemed earned and payable if the collection on the original booking occurs within 30 days of an employee's last date of employment."[11]

With minor changes, including having a subsidiary purchase some of the software, Verizon went forward with the Kana purchase.[12] Kana recognized over $2,200,000 in revenue from the Verizon sale in June, 2002, less than two months after Turner was fired.[13] Doyle announced that Turner's replacement would not receive a commission on the $2,200,000 Verizon deal.[14]

Jerry Shinn, Turner's direct supervisor at Kana, submitted a Declaration saying:

---

[9]Doyle's April 11 e-mail is attached as Exhibit 2 to this Memorandum.

[10]Doyle's April 16 e-mail is attached as Exhibit 3 to this Memorandum.

[11]Kana Software, Inc. 2002 North American Incentive Plan, Exhibit 2 to Kana's Memo.

[12]Turner Dec., paragraph 7, Ex. 4.

[13]Kana Memo at 5.

[14]Shinn Dec., paragraph 11, Ex. 1.

> I concluded that Mr. Doyle's primary motivation in firing Mr. Turner was to deprive Mr. Turner of a commission on the Verizon deal, and to increase Kana's profitability by not paying a sales commission to anyone. I concluded this based on Mr. Doyle's lack of personal knowledge about Mr. Turner's skills as a salesman, Mr. Doyle's disregard of my opinion that Mr. Turner was an excellent salesman who was not at fault for the delay in closing the Verizon deal, Mr. Doyle's insistence that no salesman would receive a commission on the Verizon deal, and Kana's financial difficulties at the time.[15]

Turner had no intention of voluntarily leaving his employment with Kana until he received a commission on the Verizon deal.[16]

## ARGUMENT

### I. PLAINTIFF HAS MADE A SUFFICIENT SHOWING THAT KANA FIRED HIM WITH THE INTENT TO DEPRIVE HIM OF A COMMISSION.

Plaintiff Turner's direct supervisor concluded that Kana's COO, Tom Doyle, fired Turner with the primary motivation of not paying him a commission on the Verizon deal. The supervisor's conclusion about Doyle's intent was not based on hunch or whim, but on clearly-articulated circumstances: that Doyle lacked personal knowledge of Turner's skills as a salesman, that Doyle disregarded the supervisor's opinion that Turner was an excellent salesman who was not at fault for the delays in closing the Verizon deal, that Doyle insisted no salesman would receive a commission on the Verizon deal, and that Kana was experiencing financial difficulties at the time.[17] Kana has admitted that Doyle never went on a sales call with Turner, had never seen him interact with customers, and had never received complaints about Turner

---

[15] Shinn Dec., paragraph 12, Ex. 1.

[16] Turner Dec., paragraph 8, Ex. 4.

[17] Shinn Dec., paragraph 12, Ex. 1.

from any customers.[18]  Doyle wrote offensive, extraordinarily hostile e-mails about Turner clearly evidencing Doyle's intent to deprive Turner of a commission, even in circumstances where Kana's written commission plan required payment of a commission.[19]

This evidence is more than sufficient to defeat Doyle's self-serving Declaration that he fired Turner for inaccurate forecasting concerning Verizon.  Indeed, Mr. Shinn directly contradicts Doyle, saying that "there were other large deals that were forecasted in prior quarters that were not closed as forecasted and those sales reps were not fired."[20]

In evaluating Kana's motion for summary judgment, this Court

> must draw all reasonable inferences in favor of the non-moving party, here, [Plaintiff Turner, and]  may not make credibility determinations or weigh the evidence. *Reeves [v. Sanderson Plumbing Products, Inc*.], 530 U.S. [133, ]at 149-150 [2000]. Although [the Court] should review the record as a whole, [it] must disregard all evidence favorable to the moving party, here, [Defendant Kana], that a jury would not be required to believe. Id. at 151.

*Edell & Associates v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435-36 (4th Cir. 2002). "Summary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence."  *Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984), *citing Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The Maryland Court of Special Appeals reversed the trial court's grant of summary judgment for an at-will employer in a very similar case.  In *Bleich v. Florence Crittenton*

---

[18]Kana's response to admission requests 23-24, attached as Exhibit 5.

[19]*See* exhibits 2 and 3 to this Memorandum.

[20]Shinn Dec., paragraph 10, Ex. 1.

*Services of Baltimore, Inc.*, 98 Md. App. 123, 632 A.2d 463 (1993), plaintiff Bleich brought claims related to her termination, arguing a public policy exception to the at-will employment doctrine. Three supervisors submitted sworn statements that they had fired plaintiff without knowledge that plaintiff had made mandatory complaints to a state regulatory agency. The trial court granted summary judgment based on those sworn statements.

The Court of Special Appeals reversed, holding that there was sufficient circumstantial evidence supporting an inference that the employer had fired plaintiff for making regulatory complaints. Judge Motz's opinion for the Court of Special Appeals favorably cited to a case on all fours with this one, *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535 (2d Cir. 1987). Judge Motz wrote that in reversing the trial court's grant of summary judgment,

> [t]he *Wakefield* court noted that there was "circumstantial evidence" supporting the salesman's claim [for an unpaid commission] including (1) his record as a "capable salesman with a reputation for success;" (2) the employer's knowledge that he had "performed the work enabling" this very large sale to "go through;" and (3) the fact that shortly after his discharge, the sales contract was signed and his employer paid no one a commission on the sale.

632 A.2d at 472-73. Turner has submitted substantially more evidence of improper intent than did the plaintiffs in *Bleich* and *Wakefield*; clearly Turner has enough evidence to support a jury verdict in his favor.

II. **KANA PREVENTED TURNER FROM EARNING A COMMISSION BY FIRING HIM, IN BREACH OF MARYLAND'S IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

Maryland law recognizes an implied covenant of good faith and fair dealing between contracting parties. In general, Maryland's implied covenant "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under

the contract." *Parker v. Columbia Bank*, 91 Md. App. 346, 366, 604 A.2d 521, 530 (1992), *citing Automatic Laundry Service v. Demas*, 216 Md. 544, 141 A.2d 497 (1958).

Here, Kana and Turner had a written contract, the 2002 North American Incentive Plan, that promised Turner a commission on the Verizon deal if Kana received payment within 30 days after his termination date, or if Kana determined that a signed contract with Verizon was a "qualified booking." Plaintiff Turner had no intention of leaving Kana's employ until he had received a commission on the Verizon deal.[21] By firing Turner shortly before Verizon removed the contingency and made payment, Kana prevented Turner from continuing his employment, arguably a condition for payment under the 2002 North American Incentive Plan. <u>The plain fact is that Turner earned the commission, and Kana reaped the benefits of his work.</u>

It is true that Turner was an at-will employee. However, the 2002 North American Incentive Plan was a separate contract between the parties, which required Kana to make payments to Turner even in circumstances where he was terminated.

Maryland courts have favorably recognized precedent and commentary holding that even when one party to a contract has an unambiguous right to act unreasonably, it cannot act unreasonably in preventing the other party from performing or realizing the fruits of the contract. In *The Electronics Store, Inc. v. Cellco Partnership*, 127 Md. App. 385, 732 A.2d 980, (1999), the Maryland Court of Special Appeals considered a claim by a non-exclusive cellphone distributor that Bell Atlantic had unreasonably rejected potential customers from a sales program with a credit union. Under the contract between the parties, Bell Atlantic had the right to reject potential cellphone customers for any reason. Applying New Jersey's implied covenant of good

---

[21]Turner Dec., paragraph 8, Ex. 4.

faith and fair dealing, the Maryland Court of Special Appeals favorably cited general commentary that strongly supports Turner's claim here:

> A brief review of some commentary addressing this implied covenant is instructive. Professor Corbin observed that, "even though the express terms of a contract appear to permit unreasonable action, the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations." 3A Arthur L. Corbin, *Corbin on Contracts* § 654A(B), at 106 (Cum. Supp. 1999); *see also Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.*, 97 F.3d 39, 42 (3d Cir. 1996). The United States District Court for the District of New Jersey, applying New Jersey law, recently approved Williston's statement that, "Included in every contract is 'an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."'" *Emerson Radio Corp. v. Orion Sales, Inc.*, 41 F. Supp. 2d 547, 1999 WL 170345, at *5 (D.N.J. 1999) (quoting *Palisades Properties,* 207 A.2d at 531, in turn quoting 5 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 670, at 159-60 (3d ed. 1961)). "Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship." *Palisades Properties,* 207 A.2d at 531. The Supreme Court of New Jersey drew on the eloquent words of Justice (then Judge) Cardozo to explain the development of this doctrine:
>
> 'The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed . . . .'"
>
> Id. (quoting *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214, 214 (N.Y. 1917)).

732 A.2d at 989.

Similarly, as stated, in *Bleich v. Florence Crittenton Services of Baltimore, Inc.*, 98 Md. App. 123, 632 A.2d 463, 472-73 (1993), Judge Motz's opinion for the Court of Special Appeals favorably cited to a case on all fours with this one, *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535 (2d Cir. 1987). Applying New York law, the Second Circuit in *Wakefield* found that a

salesman terminable at will had stated a claim for breach of the implied covenant of good faith and fair dealing, when he presented circumstantial evidence that he was fired so that his employer would not have to pay a large sales commission.

Recognizing that an employer must act in good faith in applying peripheral benefits to the employment relationship, pursuant to a specific written contract, will not limit the employer's right to fire employees. It will simply insure that employees cannot be deprived of contractually-earned benefits by the employer's right to terminate at will.

### III.  **DEFENDANT'S MOTION FOR SANCTIONS SHOULD BE DENIED.**

Defendant has filed a motion for sanctions under Fed.R.Civ.P. 11. This opposition demonstrates that Plaintiff has properly stated claims which are "warranted by existing law." Id. The local rules do not require an opposition to a motion for sanctions absent a request from the Court. Local Rule 105.8(b). Counsel for Plaintiff wrote the following letter to opposing counsel in response to her threat of filing a sanctions motion:

> Dear Becky:
>
> We have reviewed your motion for sanctions. We pled Count One, for breach of contract, and Count Two, for quantum meruit, in the alternative. Fed.R.Civ.Pro. 8(e)(2) specifically allows a party to "set forth two or more statements of a claim . . . alternately or hypothetically." As is apparent from Count One of the Complaint, Plaintiff Turner contends that the 2002 North American Incentive Plan, number 00073 in your production of documents in this litigation ("the Plan"), constitutes a legally enforceable contract between the parties. However, we pled Count Two because we did not know whether Kana would dispute the enforceability of the Plan, because Plaintiff Turner did not sign it.
>
> We are still unsure of Kana's position with respect to the legal enforceability of the Plan. Kana's Answer pled affirmative defenses that would defeat enforceability of the contract, including estoppel and statute of frauds. We sent you the following request for admission:

> 4. If you deny that your 2002 North American Incentive Plan, number 00073 in your production of documents in this litigation ("the Plan"), constitutes a legally enforceable contract between you and Plaintiff, admit that the Plan's commission schedule, coupled with Plaintiff's base salary while he worked for you, constituted fair market value for the services of a salesperson of Plaintiff's experience and history of performance.
>
> This request for admission contemplated that if Kana admitted that the Plan was a legally enforceable contract, Kana would not have to answer the balance of the request. Instead of admitting that the Plan was an enforceable contract, Kana responded "Deny." If Kana is willing to stipulate that the 2002 North American Incentive Plan, number 00073 in your production of documents in this litigation ("the Plan"), constitutes a legally enforceable contract between the parties, Plaintiff will dismiss Count Two. Please let us know Kana's position at your earliest convenience.
>
> With respect to your motion for sanctions on Count One, we believe that the claim for breach of contract is well grounded in fact and law, and we will not withdraw it. Your Rule 11 motion does not address your client's obligation of good faith and fair dealing, a requirement under Maryland law for every contract. Your client's President expressed remarkable personal hostility toward Plaintiff Turner, and announced an intent to prevent Plaintiff Turner from recovering a commission even before terminating him. Your client's proffered reasons for firing Plaintiff Turner are pretextual. Obviously, if our claim for breach of contract is frivolous, you should prevail on a motion for summary judgment. We suggest that you file your motion for summary judgment pursuant to the Court's scheduling order, and await resolution of that motion before impugning our good faith.

In response to that letter, Kana refused to enter the suggested stipulation, and Plaintiff accordingly did not withdraw Count Two of the Complaint. It appears that Kana's summary judgment motion concedes that the 2002 North American Incentive Plan was a valid contract between the parties. However, if Kana contends that the North American Incentive Plan is not a binding contract between the parties, Plaintiff must maintain Count Two in the unlikely event that a jury agrees with Kana's position.

For the reasons stated in this Opposition, Plaintiff Turner believes that Defendant's Rule 11 motion is not well grounded in fact and law, and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's Motions for Summary Judgment and for Sanctions should be denied.

Respectfully submitted,

_____
Mark London                    #07747
Christopher B. Mead            #08661
London & Mead
Suite 320
1225 19th Street, N.W.
Washington, D.C.  20036
(202) 331-3334
Counsel for Plaintiff Stuart Turner

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing **Plaintiff's Opposition to Defendant's Motion for Summary Judgment** was served via electronic filing, this 13th day of June, 2003 to:

Rebecca Strandberg, Esquire
4405 East West Highway
Suite 308
Bethesda, Maryland 20814

_____
Christopher B. Mead