IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STUART TURNER | : | |
| | : | |
| v. | : | Civil Action WMN-02-2451 |
| | : | |
| KANA SOFTWARE, INC. | : | |
| | : | |

**MEMORANDUM**

Before the Court are Defendant's Motion for Summary Judgment, (Paper No. 37), Defendant's Motion to Strike Affidavit of Jerry Shinn, (Paper No. 45), Defendant's Motion to Strike Affidavit of Stuart Turner (Paper No. 46), and Defendant's Motion for Sanctions (Paper No. 36).  These motions have been fully briefed and are ripe for decision. Upon a review of the pleadings and applicable case law, this Court determines that no hearing is necessary (Local Rule 105.6) and that Defendant's Motion for Summary Judgment will be granted in part and denied in part; and Defendant's remaining motions will be denied.

**I.   BACKGROUND**

This litigation arises out of the discharge of Stuart Turner ("Turner") from the employ of Kana Software, Inc. ("Kana") and Kana's subsequent refusal to pay Turner a sales commission.  The facts, taken in the light most favorable to Turner, begin with Turner working as a salesman for Silknet, a

1

company acquired by Kana in 2000. Jerry Shinn supervised Turner during his employment at Silknet/Kana. While working for Silknet/Kana in 1999-2000, Turner exceeded his sales quotas, bringing in over $10,000,000 in gross revenues.

In early 2001, Turner voluntarily left employment at Silknet/Kana to work for a start up company. He was rehired by Kana in May of 2001 as an Account Executive, responsible for selling enterprise software applications to large corporations under the supervision of Mr. Shinn.

Turner's offer letter, dated April 30, 2001, stated that he would be paid an annual salary of $100,000 and would also earn commissions based on his sales. The letter further established that Turner was to be an employee "at will." His commissions were governed by a separate agreement, titled the 2002 North American Incentive Plan ("the Plan"). Under the Plan, Turner would earn commissions ranging from 6% to 12% of his qualified booked sales. The Plan included a clause explaining that, "Commissions will be deemed earned and payable if the collection on the original booking occurs within 30 days of an employee's last day of employment. Except for the foregoing, commissions not earned at the time employment terminates (for any reason) cannot be thereafter earned." (Defendant's Exhibit 2).

From the date of Mr. Turner's rehire in May of 2001, until his termination on April 18 of 2002, he concentrated his efforts towards making one large sale to Verizon Internet Solutions ("VIS"), and did not make his quarterly sales quota of $625,000. Turner originally predicted a sale of over $6,000,000 of software to VIS to be completed by December 31, 2001. There were problems, however, in finalizing the sale, and a subsequent reorganization of VIS in January of 2002 resulted in VIS's interest in Kana's software being reduced to approximately $2,200,000. Turner predicted that a sale for this smaller amount would close by March 31, 2002. During this same time period (from late 2001 to early 2002), there is evidence that Kana was experiencing financial difficulties. By March 31, 2002, representatives for VIS and Kana did sign a contract for $2,643,200, but also included a contingency clause allowing VIS to terminate the agreement if they were not able to secure financing by April 23, 2002.

In April of 2002, Kana's Chief Operating Officer, Tom Doyle, expressing dissatisfaction with the VIS contract contingency clause, instructed Mr. Shinn to fire Turner. Specifically, Mr. Doyle wrote an April 11th email stating, "Stuarts (sic) last day is Tuesday irrespective of when this deal gets done. If it come (sic) in on Wed. for $20m+ that

loser unprofessional amateur is fired irrespective and we owe him nothing other than a thorough beating in the parking lot." (Plaintiff's Exhibit 2). Five days later, Mr. Doyle wrote an additional email to Mr. Shinn which included that, "Stuart gets paid nothing on any Verizon deal." (Plaintiff's Exhibit 3).

Turner received a letter dated April 18, 2002 which explained that he was being terminated for unsatisfactory performance. In June of 2002, contracts were signed by VIS and a subsidiary for $2,284,000. Neither Turner, nor any other sales representative was ever paid a commission for the VIS sale.

On July 24, 2002 Turner filed a complaint against Kana alleging Breach of Contract and in the alternative, Unjust Enrichment/Quantum Meruit. Turner seeks the $133,000 he alleges that he is due as a commission for his role in negotiating the deal between Kana and VIS. Kana has moved for summary judgement on both counts, and has additionally moved for Rule 11 sanctions against Turner's counsel and for portions of the affidavits submitted by Turner to be stricken from the record.

**II. LEGAL STANDARD**

Summary Judgment is proper if the evidence before the court,

consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the burden "of informing the district court of the basis for its motion . . . and identifying" the portions of the opposing party's case that demonstrate the absence of a genuine issue of material fact.  <u>Id.</u> at 323.  A material fact is one "that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 249.

If the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial.  <u>Celotex</u>, 477 U.S. at 324.  Unsupported speculation is insufficient to defeat a motion for summary judgment.  <u>Felty v. Graves-Humphreys Co.</u>,

818 F.2d 1126, 1128 (4th Cir. 1987)(citing <u>Ash v. United Parcel Serv., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." <u>Id.</u>

Finally, in assessing such a motion, the Court must view the evidence and all justifiable inferences in the light most favorable to the party opposing the motion. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam).

With these principles in mind, the Court will address the arguments presented by the parties.

**III. DISCUSSION**

Before entertaining the merits of this action, the Court finds it important to clarify what this case does, and does not, concern. Despite Kana's arguments to the contrary, Turner's action does not seek to enforce his contract of employment, but rather the Plan governing his sales commissions. Turner's arguments style this case as a breach of the implied covenant of good faith and fair dealing in the Plan and he seeks only the commissions to which he alleges he

would have been entitled had Kana not discharged him in bad faith.  No argument is made for Turner's reinstatement, nor for damages to compensate him for lost wages.  Thus, this case does not concern a cause of action for discharge in violation of public policy, as discussed in <u>Adler v. American Standard Corp.</u>, 432 A.2d 464 (Md. 1981).

**A. Count One - Breach of Contract**

As recently as 1990, Maryland's highest court proclaimed that "public policy [] implies a covenant of good faith and fair dealing in every contract."  <u>Julian v. Christopher</u>, 320 Md. 1, 9, 575 A.2d 735, 739 (1990).  This covenant's requirement has been long established in the common law of contracts generally, and in Maryland in particular.  <u>See</u>, <u>e.g.</u>, <u>Food Fair Stores, Inc. v. Blumberg</u>, 234 Md. 521, 534, 200 A.2d 166, 174 (1964); <u>Automatic Laundry Service v. Demas</u>, 216 Md. 544, 550-51, 141 A.2d 497, 500-01 (1958); 13 <u>Williston on Contracts</u>, § 38:15 (4th ed. 2003); Restatement (Second) of Contracts § 205 (1990).  Simply put, the covenant "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."  <u>Eastern Shore Mkts., Inc. v. J.D. Associates Ltd. P'ship</u>, 213 F.3d 175, 182-83 (4th Cir. 2000)(<u>citing</u> <u>Parker v. Columbia Bank</u>, 91 Md. App. 346, 366, 604 A.2d 521,

531 (1992)).

In disputing the covenant's application to the present case, Kana cites to Suburban Hospital v. Dwiggins, 324 Md. 294, 596 A.2d 1069 (1991).  The Dwiggins court, rejecting a claim based on the fairness of an employee grievance mechanism, explained that, "[a]lthough we have generally implied a covenant of fair dealing in negotiated contracts, there is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will."  Id. at 309, 596 A.2d at 1076-77.  At first blush, this language might appear dispositive of the present issue as Kana contends.  This Court, however, is persuaded by Turner's argument that the present case differs from Dwiggins in that the dispute centers around Turner's commissions contract, rather than his employment contract.

In wrestling with the issue of good faith and fair dealing in an employment at-will situation, the Dwiggins court was presented with facts under which the employee claimed that he was no longer employed at-will, but instead could only be terminated for cause.  Id. at 301-02, 596 A.2d at 1073.  The Dwiggins court acknowledged that, "[a]dding the element of general fairness and due process to the grievance procedure alters [the] at-will status, and care should be taken before a

court decides that the parties intended such a result." Id. at 309, 596 A.2d at 1076. The decision carved out a reasonable exception to the implication of a contractual covenant of good faith and fair dealing, when its result would be to indefinitely prolong the employment of an individual that the employer wished to terminate.

In contrast, the present controversy stems from Turner's allegations that he was terminated precisely to avoid Kana's obligation to pay him a commission on a sale that he had all but finalized. He implicitly concedes that Kana could fire him for any reason or no reason at all, except for the narrow reason of denying him a contractual benefit. The Court is of the same opinion.

The Court finds persuasive the Second Circuit's reasoning in Wakefield v. Northern Telecom, 813 F.2d 535 (2nd Cir. 1987), a case involving facts nearly identical to the present controversy.[1] Applying New York law, the Second Circuit found that a salesman terminable at-will had stated a claim for breach of the implied covenant of good faith and fair dealing when he presented circumstantial evidence that he was fired so

---

[1] The Wakefield decision was also cited favorably by Judge Diana Motz in her decision for the Maryland Court of Special Appeals in Bleich v. Florence Crittenton Services of Baltimore, Inc., 98 Md. App. 123, 142-43, 632 A.2d 463, 472-73 (1993).

that his employer would not have to pay a large sales commission.  Id.  The limited scope of the claim, however, was demonstrated through the criticism of the jury instructions given by the trial court.  Id. at 538.  While the trial court had permitted recovery for the plaintiff on a simple finding of bad faith termination, the Court of Appeals explained that, "the jury should have been told that it could not find in favor of Wakefield unless it found that his termination had been substantially motivated by NTI's desire to deny him commissions and was not part of a legitimate reduction in force or the result of dissatisfaction with him."  Id.  The Wakefield court thus clarified that the holding did not essentially alter the at-will relationship by protecting employees from all bad faith discharges.  Instead, the court merely enforced a side contract concerning compensation between employer and employee.

This Court is convinced that Dwiggins does not bar the implied covenant of good faith and fair dealing's application to a commissions contract simply because an at-will employee is involved.  The court will enforce Maryland's traditional rule that "in every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others."  Food Fair Stores, Inc. v.

10

Blumberg, 234 Md. 521, 534, 200 A.2d 166, 174 (1964), quoted in Eastern Shore Mkts., Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 182-83 (4th Cir. 2000).  Having confirmed that Turner's cause of action is proper, the Court now turns to whether there exists a genuine issue of material fact sufficient for Turner to survive summary judgment.

 Turner implicitly acknowledges that, according to the express terms of the Plan, he was not due a commission on the ultimate sale of software from Kana to VIS subsidiaries that was consummated in June of 2002, more than 30 days after Turner's termination.  Were Turner's breach of contract claim to turn on the Plan's express terms, then summary judgment for Kana on Count One would surely be warranted.  Turner's argument, however, disputes Kana's good faith, an implied term of the Plan.  Accordingly, Kana's motion for summary judgment must be evaluated by whether Turner has produced enough evidence to create a genuine issue of material fact as to Kana's motivation for firing him.

 Assuming arguendo that all of the affidavit strikes requested by Kana are warranted, the Court finds that there is sufficient circumstantial evidence underlying the affidavits to create a material issue as to Mr. Doyle's state of mind in ordering Turner's termination.  In making this determination,

11

the Court considers that "[s]ummary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of a claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence." Magill v. Gulf & W. Indus., Inc., 736 F.2d 976, 979 (4th Cir. 1984)(citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). Furthermore, at the summary judgment stage, the court "must draw all reasonable inferences in favor of the non-moving party." Edell & Associates v. Law Office of Peter G. Angelos, 264 F.3d 424, 435-36 (4th Cir. 2002).

Here, the circumstantial evidence submitted by both parties demonstrates the following undisputed facts:

> 1. Turner spent the latter months of 2001 through April 18th of 2002 working toward a multi-million dollar sale of software from Kana to VIS.
>
> 2. During this same time period, Kana was experiencing financial difficulties.[2]
>
> 3. Kana and Turner had a written contract that promised Turner a commission on the VIS deal if Kana received payment within 30 days after his termination date, or if

---

[2] This statement is argued as immaterial by Kana in its Motion to Strike portions of Jerry Shinn's affidavit, but its truth is not disputed.

Kana determined that a signed contract with VIS was a "qualified booking."

4. Turner negotiated a contingent sale agreement between Kana and VIS for over $2,200,000 by March 31, 2002.

5. Kana's president, Tom Doyle, wrote in an April 11th, 2002 inter-office email that Turner would be fired and paid nothing for the VIS sale regardless of when it was finalized.[3]

6. Turner was officially terminated on April 18, 2002.

7. A sales agreement between Kana and VIS was finalized in June of 2002 for over $2,200,000.

8. Neither Turner nor any other Kana sales representative received a commission for the VIS sale.

Even without the statements of Stuart Turner and Jerry Shinn that Kana argues should be struck,[4] the Court is persuaded that the above facts give rise to a reasonable inference that Turner was fired to prevent him from qualifying for a commission on the VIS sale under the terms of the Plan.

---

[3] This sentiment was repeated in an April 16th email from Mr. Doyle to Jerry Shinn stating that Turner "gets paid nothing on any Verizon deal." (Plaintiff's Exhibit 3).

[4] Kana's arguments challenge various segments of the affidavits as: immaterial, conclusory, lacking a factual foundation, impermissible state of mind opinion evidence, and in conflict with previous deposition testimony.

If this inference were proven to a jury's satisfaction, it would unquestionably entail liability on Kana's behalf for breach of the covenant of good faith and fair dealing, implicit in Kana's contract with Turner governing sales commissions.

The only case cited by either party with analogous facts is the previously discussed <u>Wakefield</u> decision by the Second Circuit.  The <u>Wakefield</u> court, in denying summary judgment to the employer on the issue of motivation for plaintiff Wakefield's discharge, described the circumstantial evidence as follows:

> Wakefield's superiors were aware that Wakefield was working on sales of some $16 million that were about to come to fruition; that these included a $12 million sale to IBM which would have been the largest sale of a switch in the industry up to that time; that Wakefield was regarded by his superiors as a capable salesman with a reputation for success; that Wakefield had performed the work enabling the sales to go through; that shortly after Wakefield's termination, the $12 million IBM sales agreement was signed; and that NTI paid no one a commission on that sale.

813 F.2d at 540.  The Second Circuit found summary judgment inappropriate despite the employer's countervailing evidence that Wakefield was terminated as part of a general workforce reduction and despite Wakefield's inability to present any direct evidence of his employer's goal to deprive him of a large commission.  <u>Id.</u>

In the present controversy, Turner has an arguably weaker set of circumstantial evidence from which to infer bad faith on Kana's behalf. His potential commission for the VIS sale, while exceeding Turner's annual salary, is not represented as abnormally large for Kana's business. Likewise, despite the support of his direct supervisor, Jerry Shinn, as to Turner's acumen as a salesperson, there is the objective evidence that outside of the VIS transaction, Turner made no sales from the date of his rehire in May of 2001 to his termination in April of 2002. In the face of these weaknesses, however, Turner has the unusual luxury of direct evidence that Kana had a bad faith motive for his discharge.

Few, if any, employees will have documented statements by their employers announcing a plan to dishonor their benefits contracts, no matter whether the factual circumstances would make that dishonor a breach of the contract's express terms. In Plaintiff's Exhibit 2, Turner has just such a smoking gun. Kana President Tom Doyle's inter-office email dated April 11th, 2002 states, "Stuarts (sic) last day is Tuesday irrespective of when this deal gets done. If it come (sic) in on Wed. for $20m+ that loser unprofessional amateur is fired irrespective and we owe him nothing other than a thorough beating in the parking lot." Mr. Doyle's email evinces an intent to deprive

Turner of commissions no matter what.  If such evidence does not give rise to an inference of bad faith, then the Court is unsure whether a plaintiff pleading a contractual breach of Maryland's implied covenant of good faith and fair dealing could ever proceed to trial.

### B. Count Two - Unjust Enrichment/Quantum Meruit

Kana's answers to interrogatories as well as its pleadings satisfy the court as an admission that the 2002 North American Incentive Plan is an express and legally enforceable contract governing commissions payable from Kana to Turner.  Accordingly, Count Two of Turner's complaint for Unjust Enrichment/Quantum Meruit recovery is barred under Maryland law.  See County Commissioners of Caroline County v. R.J. Dashiells, 358 Md. 83, 101, 747 A.2d 600, 609 (2000) ("[G]enerally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists.").  The Court will grant summary judgment to Kana as to this count.[5]

---

[5] The Court will not, however, grant Rule 11 sanctions against counsel for Turner for either count of their initial complaint.  As discussed above, the Court finds Turner's claim for breach of contract through violation of the implied covenant of good faith and fair dealing to be warranted under existing Maryland law.  Furthermore, it appears that counsel for both sides have made some good faith effort through

**IV. CONCLUSION**

For all the above stated reasons, Defendants' Motion for Summary Judgment will be denied for Count One and granted for Count Two. Defendant's remaining motions will be denied. A separate order will issue.

/s/

_____

William M. Nickerson
United States District Judge

Dated: September 26, 2003.

---

letters to resolve ambiguities in their positions concerning the legal status of the Plan before resorting to the sanctioning authority of the Court. While the Court sincerely wishes that a stipulation could have been agreed to which would have allowed the quantum meruit count to be dismissed consensually, the Court can understand why such an arrangement was difficult given the parties' underlying postures as to the covenant of good faith and fair dealing.